IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**　　　:
　　　　　　　　　　　　　　　　　:　　**Crim. No. 1:14-CR-054**
　　　　　　　　　　　　　　　　　:
　　　　　　**v.**　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:　　**Judge Sylvia H. Rambo**
　　　　　　　　　　　　　　　　　:
**DONALD JACKSON, JR.**　　　　　 :

## M E M O R A N D U M

Presently before the court is Defendant's motion to suppress, which seeks exclusion of all evidence obtained by parole officers as the result of a warrantless search of his vehicle. Upon consideration of the testimony and evidence presented at the suppression hearing, the court concludes that the officers did not have reasonable suspicion to search the vehicle and that Defendant did not consent to the search. The court will therefore grant the motion to suppress in its entirety.

## I.　　Background

### A.　　Procedural Background

On February 26, 2014, a federal grand jury returned a one-count indictment charging Defendant Donald Jackson Jr. with possession of cocaine base with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C). (Doc. 1.) On March 4, 2014, Defendant pleaded not guilty to the indictment. (Doc. 10.) On July 7, 2014, Defendant filed a motion to suppress evidence (Doc. 22) and brief in support (Doc. 23), wherein he argued that the cocaine base should be suppressed because state parole officers did not have reasonable suspicion to conduct the search of the vehicle and that he did not consent to the search. (Doc. 22, ¶ 24.) On September 25, 2014, the court held a hearing on Defendant's motion to suppress, and

on October 20, 2014, the Government filed a brief in opposition to the motion.  (Doc. 47.)  Therefore, the motion is ripe for consideration.

### B.   Factual Background

The court makes the following findings of fact based upon the evidence and testimony presented at the suppression hearing.

On December 17, 2013, Defendant, who was a parolee under the supervision of the Commonwealth of Pennsylvania Board of Probation and Parole ("Parole Board"), borrowed his sister's 2005 Volvo to drive to Harrisburg Area Community College's ("HAAC") Midtown Campus, which is located within the Middle District of Pennsylvania, for his initial appearance at "Reentry Court" due to his history of parole violations, including testing positive for marijuana, violating curfew, and failing to retain employment.  (Doc. 45, Hearing Transcript ("N.T.") at pp. 6-8, 53-55, 86, 98-100, 104-105.)  At this time, Defendant possessed a valid Pennsylvania driver's license, permitting him to lawfully operate a vehicle.

Although the Parole Board directed Defendant to report to HACC's Midtown 2 Campus ("Midtown 2"),[1] Reentry Court is actually held at HACC's Midtown 1 Campus ("Midtown 1").[2]  Uncertain as to where he was going, Defendant drove along Fourth Street and stopped at a crosswalk in front of Midtown 1 to allow Parole Agent Peter Hans ("Agent Hans") and Parole Agent Georgia Latsha ("Agent Latsha") to cross the street.  (N.T. at pp. 12, 56, 100.)  As he was stopped, Defendant looked to his far right toward Midtown 2 to assess his whereabouts.  (*Id.* at p. 100.)

---

[1]  Midtown 2 is actually located at Third and Reily Streets, although the address given to Defendant by the Parole Board was for Fourth and Reily Streets.  (*See* Gov. Exh. 11; Def. Exh. 111; N.T. p. 121.)

[2]  Midtown 1 is located at Fourth and Boyd Streets.  (*See* Def. Exh. 111; N.T. p. 121.)

Agent Hans and Agent Latsha have over thirty years combined experience as parole officers.  (*Id.* at pp. 6, 12, 52.)  Agent Latsha had supervised Defendant in the past and recognized him as the driver of the Volvo.  (*Id.* at 56.)  Agent Latsha identified Defendant to Agent Hans, who had never met Defendant, and both officers noticed that Defendant had turned his head away from them, which they testified was aimed at concealing his identity.  (*Id.* at pp. 13, 57.)  At the hearing, Agent Hans testified that Jackson was "craning [his] head . . . all the way to the right," and "appeared evasive, from [his] experience."  (*Id.* at p. 13.)  Agent Latsha "found it odd that [Defendant] was trying to look away from her . . . [and] surmised from . . . [her] experience that perhaps he wasn't supposed to be driving."  (*Id.* at p. 57.)

Agent Hans and Agent Latsha proceeded to a second floor classroom to make preparations for that day's session.  (*Id.* at p. 15.)  Other members of the Parole Board were also present, including Central Regional Director Kelly Evans ("Director Evans"), Chairman Potteiger, Parole Agent Matthew Shaffer ("Agent Shaffer"), and Parole Manager Yarnell Gorba.  (*Id.* at pp. 17-18.)  Prior to bringing the parolees into the classroom, the officials discussed the parolees' case files.  (*Id.* at p. 15.)  Defendant's parole history was discussed at this case file meeting.  (*Id.* at pp. 15, 59.)

After parking approximately one and a half blocks from Midtown 1,[3] Defendant entered the building and waited on the first floor with the other parolees.  (*Id.* at 17, 25, 110.)  Still suspicious by Defendant's apparent evasiveness at the

---

[3]  The Government argues that parking was readily available near Midtown 1 and that Defendant's choice to park a block and a half away from the building suggests that he was trying to hide the fact that he had driven to the session.  However, the evidence presented at the hearing showed that the parking lots surrounding Midtown 1 were restricted to HACC students and faculty.  (N.T. at p. 119.)  In addition, Defendant testified that he initially thought he was going to Midtown 2, which was in closer proximity to where he parked.  (*Id.* at p. 110.)

crosswalk, Agent Hans volunteered to go downstairs to accompany the parolees up to the classroom so that he would have a moment to speak alone with Defendant. (*Id.* at 18.) As the group proceeded up the stairs, Agent Hans approached Defendant and introduced himself. (*Id.* at pp. 18, 102.) He then asked Defendant to empty his pockets, and Defendant complied. (*Id.* at p. 102.) Defendant pulled several belonging out of his pockets, including a cell phone, car keys, and cash. (*Id.*) Agent Hans took the car keys and instructed Defendant to proceed to the clas sroom with the other parolees.[4] (*Id.*)

Defendant was the first parolee called to address the panel of parole officials. (*Id.* at p. 103.) As he stood before them, his car keys sat visibly on the panel's table. (*Id.* at pp. 61, 81, 87, 103.) In response to the panel's questions regarding his parole violations, Defendant was defensive but acknowledged his violations. (*Id.* at pp. 62-63; Gov. Exh. 1, p. 3 of 4.) At some point during the panel's questioning, Agents Hans and Shaffer, acting at the direction of Chairman

---

[4] Agent Hans's account of this conversation varies considerably from Defendant's account. Notably, Agent Hans testified that, as they were walking up the stairs, he asked Defendant if he had driven to the session, and Defendant responded that he had not. (N.T. at p. 18.) Because he suspected that Defendant was being deceptive, Agent Hans asked Defendant if he had any keys in his possession. (*Id.*) Defendant responded affirmatively and removed a Volvo key from his pocket. (*Id.*) Agent Hans confiscated the Volvo key. (*Id.* at 20.) Agent Hans further testified that he informed Agent Latsha, and possibly Director Evans and Chairman Potteiger, that Defendant had been deceptive and that he had confiscated Defendant's car keys. (*Id.* at pp. 20-21; 49.)

Whether Defendant had lied about driving to the session would be significant to the circumstances underlying the officers' reasonable suspicion to search the vehicle, yet the Government has put forth no evidence on this key issue besides the testimony of a single officer. Agent Hans's testimony is not corroborated by the other officers and Defendant's alleged deception is not memorialized in any reports. At the hearing, Director Evans had no recollection of being told about the lie (*id.* at pp. 80-81, 86), and there is no mention of the lie in her report (Gov. Exh. 7). Likewise, Agent Latsha had no recollection of Agent Hans speaking to her about the discussion he had with Defendant in the stairway (*id.* at pp. 61, 71) and the lie is not noted in her report (Gov. Exh. 1, p. 3 of 4.). Significantly, Agent Hans reviewed Agent Latsha's report for factual accuracy at the time it was drafted and did not make any changes. (N.T. at pp. 42-46.) Moreover, Agent Hans's memory appeared generally impeded at the hearing and he failed to make a report of his own. Accordingly, the court accepts Defendant's version of the conversation because it is more consistent with the remainder of the evidence.

Potteiger, removed Defendant's car keys from the table and proceeded to leave the classroom to search his vehicle.[5]  (*Id.* at pp. 45-46, 77, 78. )  Before they exited, however, Director Evans asked for Defendant's consent to the search.  (*Id.* at p. 77.)  She first asked Defendant if there was anything in the vehicle that the officers needed to be made aware of prior to searching it, and he replied in the negative.  (*Id.* at p. 77; Gov. Exh. 7.)  She then asked Defendant if he would consent to the search, to which Defendant refused, reasoning that he could not provide consent because it was not his vehicle.  (*Id.* at pp. 21, 24, 77, 93,104-105; Gov. Exh. 7.)  Director Evans explained to Defendant that he could, in fact, lawfully provide his consent to the search because the vehicle was under his control.  (*Id.* at p. 77, Gov. Exh. 7.)  She then probed further for his consent, and Defendant reiterated that he could not provide it but suggested the officers contact his sister, the vehicle's owner, to ask for her consent.  (N.T. at pp. 88, 104-105.)  Agent Latsha stated that there was no reason to belabor the issue and advised Agents Hans and Shaffer to go search the vehicle.[6]  (*Id.* at p. 105.)

---

[5]  Agent Hans testified that he was not concerned with whether Defendant provided consent because he had reasonable suspicion to search the vehicle and would have done so even if Defendant refused to provide his consent.  (N.T. at pp. 21-22.)

[6]  The Government and Defendant take conflicting positions as to whether Defendant eventually provided consent to the search.  Agents Hans and Latsha both testified that Defendant immediately consented to the search *without objection*.  (N.T. at pp. 24, 63-64.)  This appears implausible and is in direct conflict with the testimony of Director Evans.  Director Evans testified that, although Defendant initially refused to consent because he did not own the vehicle, he eventually consented once he was told that he was authorized to provide to do so and after she "probed further" for his consent.  (*Id.* at pp. 77, 88.)  Defendant, who the court found credible, testified that he did not provide his consent because it was not his vehicle.  (*Id.* at pp. 104-105.)  Defendant's testimony was corroborated by the testimony of Charles Horne, another parolee in attendance at the Reentry Court session that day.  (*Id.* at pp. 93-94.)  The court finds that the evidence is divided as to this issue and concludes that Defendant never provided consent, crediting his version of the events based on the corroboration of Charles Horne and due to the significant inconsistencies of the parole officers' testimony.  The court notes that, when considering such divided factual accounts, the burden of proving voluntariness of consent rests with the Government.  *United States v. Parson*, 599 F. Supp. 2d 592, 598 (W.D. Pa. Feb. 25, 2009).

Agent Hans and Agent Shaffer "eventually found" the Volvo in an apartment complex on Reily Street.  (N.T. at p. 25.)  In the vehicle, they located hundreds of dollars in cash in the driver's side door and a plastic bag containing what appeared to be crack cocaine in the glove box.  (*Id.* at p. 26.)  Pursuant to established procedure, they immediately secured the car and notified the Harrisburg Police Department.  (*Id.* at pp. 26-27.)  Agent Shaffer then returned to the classroom to arrest Defendant and Agent Hans remained at the vehicle waiting for the police to arrive. (*Id.* at p. 27.)

Defendant was placed into custody and taken in a police car to his vehicle.  (*Id.* at pp. 108-109.)  While he was seated in the police car, an officer with the Harrisburg Police Department advised him of his Miranda rights and questioned him regarding the seized crack cocaine.  (*Id.* at p. 109; Doc. 23, p. 4 of 12.) Defendant admitted the drugs belonged to him.  (N.T. at p. 109.)

## II.        <u>Legal Standard</u>

Federal Rule of Criminal Procedure 41(h) provides that "[a] defendant may move to suppress evidence in the court where trial will occur, as Rule 12 provides."  Rule 12 provides that suppression motions should be made prior to trial. Fed. R. Crim. P. 12(b)(3)(c).  A defendant who files a motion to suppress ordinarily carries the burden of proof.  *United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992).  However, where a search is conducted without a warrant, as is the case here, the burden shifts to the government to demonstrate by a preponderance of the evidence that the warrantless search was conducted pursuant to one of the exceptions to the Fourth Amendment's warrant requirement.  *United States v. Santos*, 340 F. Supp. 2d 527, 533 (D.N.J. 2004).  As discussed *infra* Part III.A. and B., these

exceptions include an officer's reasonable suspicion that the parolee is involved in legal wrongdoing and a parolee's voluntary consent to the search.

**III.**         <u>**Discussion**</u>

Defendant moves the court to suppress evidence and statements obtained as a result of the parole officers' search of his vehicle.[7]  Defendant argues that the search and seizure was conducted without reasonable suspicion and without his consent.  The Government argues that the officers had reasonable suspicion to conduct the search and that, in any event, Defendant voluntarily consented to the search, thus removing the need for a warrant or reasonable suspicion.

**A.**    <u>**Reasonable suspicion to search the vehicle**</u>

The Fourth Amendment protects citizens against oppressive and unjust governmental intrusions.  *See* U.S. Const. amend. IV.  Ordinarily, the Fourth Amendment requires government officials to have both probable cause and a warrant to conduct a search.  *United States v. Baker*, 221 F.3d 438, 443 (3d Cir. 2000)  "In the case of parolees, however, the requisite level of suspicion is reduced and a warrant is not required."  *Id.*  A parolee's car or home can be searched on the basis of reasonable suspicion alone.  *United States v. Yeager*, 351 F. App'x 718, 719-20 (3d Cir. 2009).  "To decide whether 'reasonable suspicion' exists, [the court] consider[s] the totality of the circumstances to determine whether the 'officer has a particularized and objective basis for suspecting legal wrongdoing.'"  *United States v. Lynch*, 459 F. App'x 147, 149-50 (3d Cir. 2012).  "This process allows officers to draw on their own experiences and specialized training to make inferences from and deductions

---

[7]  The court recognizes that Defendant was not the owner of the vehicle.  However, for ease of reference, the court will refer to the Volvo as Defendant's vehicle for purposes of resolving the instant motion.

about the cumulative information available to them that might well elude an untrained person." *United States v. Henry*, 360 F. App'x 395, 397 (2010).  Although an officer's mere "hunch" is insufficient to satisfy reasonable suspicion, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* However, the decision to search must be based on "*specific* facts." *Baker*, 221 F.3d at 444 (emphasis supplied); *Terry v. Ohio*, 392 U.S. 1, 21 (1968) (holding that reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion" of a warrantless search").

In *United States v. Hill*, 967 F.2d 902, 909 (3d Cir. 1992), police officers responded to a report from a parolee's estranged wife that he had committed several parole violations, including keeping guns and drugs in a home that they jointly owned.  *See id.* at 911.  The Third Circuit found that these facts were specific enough to give rise to reasonable suspicion.  *Id.*  Likewise, in *United States v. Eggleston*, 243 F. App'x 715 (3d Cir. 2007), the Third Circuit examined the totality of the circumstances surrounding the search of a parolee's residence and concluded that the search was justified.  The parole officers in *Eggleston* conducted the search because the defendant had previous drug trafficking convictions and had recently tested positive for low levels of cocaine, which suggested that he had been handling cocaine rather than using it.  *Id.* at 716.  They had also seen the unemployed defendant on a new motorcycle and had heard from other parolees that he was selling drugs.  *Id.*  Finally, when they asked him for keys to his residence, he responded that he had lost them.  *Id.*  Placing particular emphasis on the defendant's testing positive for low levels of cocaine, the court found that this test in addition to the other

information reasonably led the officers to suspect that the defendant was dealing drugs and that there would be evidence of that activity in his home. *Id.* In other words, the officers in *Eggleston* articulated specific facts that objectively could support a reasonable suspicion that the defendant had contraband in his residence.

In *Baker*, by contrast, the Third Circuit rejected the Government's claim that the law enforcement officers had reasonable suspicion. The parolee in *Baker* was arrested after he attempted to drive away from a visit with his parole officer for violating a condition of his parole that required him to refrain from driving. *Baker*, 221 F.3d at 440. Upon searching the vehicle, the law enforcement officers discovered that it was registered in someone else's name, and the defendant was unable to produce documentation to show that he owned the vehicle, which was in further violation of his parole. *Id.* at 440, 444. Thereafter, the law enforcement officials searched the trunk and found drug paraphernalia. *Id.* at 440-41. The Third Circuit concluded that, although the search of the vehicle was conducted incident to the defendant's arrest for committing two parole violations, the officers did not have reasonable suspicion to search the trunk of the vehicle. Finding that "a mere suspicion that a [parolee's] car might be stolen [did not] justif[y] a search of the trunk of that car," the court explained that "[t]he parole officers' actions were not based on 'specific facts' giving rise to suspicion that there would be some evidence of a further violation of parole in the trunk." *Id.* at 444. Specifically, the court explained that neither of the defendant's parole violations—driving without a license or failing to document ownership of the vehicle—could "give rise to a reasonable suspicion that he was committing other, unspecified, unrelated parole violations—the evidence of which might be found in the trunk." *Id.* at 445.

Here, as in *Baker*, the parole officers' actions were not based on specific facts giving rise to a reasonable suspicion that evidence of further parole violations might be found in Defendant's vehicle.  Indeed, at the suppression hearing, the parole officers were unable to point to any specific facts that could support such suspicion. Agent Latsha testified that she could not recall the basis tending to support reasonable suspicion.  (N.T. at p. 72.)  Although Director Evans testified that there was "no doubt" the officers had reasonable suspicion based on Defendant turning his head away from Agent Latsha as he was driving (*id.* at p. 79), she agreed that her incident report failed to articulate any basis for such suspicion (*id.* at p. 87).  Director Evans also testified as to additional facts thought by her but not presented to Director Hans or the other officers, namely that Defendant was wearing clothes and driving a vehicle that he should not have been able to afford.  (*Id.* at pp. 80, 85-86.) These thoughts, however, could not have formed any part of the factual basis for the search as Director Evans played no role in making the decision to search the vehicle and there is no indication that these thoughts were shared with the other officers.  Thus, the court is left with Agent Hans's testimony in deciding whether the officers had reasonable suspicion.

Agent Hans testified that he formed the intention to search the vehicle based on two facts, namely that:  (1) Defendant appeared evasive when he turned his head away from the officers as they crossed the street (N.T. at pp. 20, 22); and (2) that Defendant recently entered the Reentry Court program as a result of his testing positive for marijuana, missing curfew, and failing to retain employment (*Id.* at p. 22).[8]  Contrary to Agent Hans's belief, these facts are far from sufficient to meet the

---

[8]  Agent Hans initially stated that he made the decision to search the vehicle based on
(continued...)

requisite standard, which requires law enforcement officers to articulate *specific* facts sufficient to establish a *reasonable* suspicion that *legal wrongdoing* is occurring.  The facts proffered by Officer Hans establish, at most, a mere hunch that legal wrongdoing is occurring.

If the court were to accept Agent Hans's explanation that he had reasonable suspicion to believe a parole violation was taking place simply because Defendant had previously committed a parole violation, it would be akin to condoning an officer's search of a parolee any time a parole violation occurred.  This is contrary to case law.  In *Baker*, the Third Circuit held that it was unreasonable for the law enforcement officers to search the trunk of the vehicle the defendant had been driving even though he had just committed two parole violations that were related to the vehicle, *i.e.*, driving the vehicle without a license and failing to provide documentation of ownership of the vehicle.  *Baker*, 221 F.3d at 444-45.  Pennsylvania law requires an officer to articulate a specific basis for reasonably suspecting that the parolee was committing other specified parole violations, *evidence of which might be uncovered by a search*.  *See id.* at 445.  The law does not support the search of a parolee's vehicle simply based on unrelated parole violations.        Agent Hans's explanation that he believed—in light of Defendant's existing parole violations—that an additional parole violation was occurring because Defendant turned his head away from the officers is likewise insufficient.  Defendant was en route to Reentry Court when he stopped at a crosswalk directly in front of the building where the session was

---

[8](...continued)
Defendant appearing evasive at the crosswalk, but he later emphasized that Defendant had also lied when asked if he drove to the session. (*Id.* at pp. 22, 49.)  The court has already found that Agent Hans's recollection of Defendant lying to him about driving to the session is unreliable.  Therefore, the court will not take the alleged lie into consideration as a factual basis for the officers' reasonable suspicion.

being held to permit Agent Hans and Agent Latsha to cross the street. Defendant was clearly expecting to see them.[9] Even assuming Defendant appeared evasive, Agent Latsha testified that she surmised from her experience that he was trying to avoid being seen because he was unauthorized to drive. While the court deems this reasonable, such a suspicion would not rise to the level of permitting the officers to search the vehicle at a temporally distant point, especially when the search was conducted *after* the officers discovered that Defendant was, in fact, licensed to drive. What the officers could discover in support of their reasonable suspicion that a parole violation was occurring related to Defendant driving by searching Defendant's vehicle remains unanswered based on the facts presented here. Agent Hans did not offer any specific explanation as to why he thought evidence of a violation would be found in the car. Instead, Agent Hans's testimony reflected that he was on a fishing expedition based on a hunch that Defendant was involved in legal wrongdoing. However, "reasonable suspicion requires more than amorphous concerns about the way a parolee acts or behaves." *United States v. Rivera*, 727 F. Supp. 2d 367, 376 (W.D. Pa. 2010). Under Pennsylvania law, parole officers are not permitted "to poke around in parolees' private spaces because they are curious or because they believe that parolees may be hiding something." *Id.* Rather, parolees are entitled to some protection against the unfettered intrusion into their privacy. *Id.* Accordingly, taking into account the totality of the circumstances surrounding the search of Defendant's vehicle, the court can only conclude that the officers did not have reasonable suspicion supported by specific facts to search the vehicle. Thus, the evidence seized

---

[9] Defendant was specifically directed to report to Agent Latsha (*see* Gov. Exh. 11), and was familiar with her as she was his parole agent at some point in the past.

from the vehicle will be suppressed unless the Government can establish that Defendant voluntarily consented to the search.

### B.   Voluntariness of consent to search the vehicle

As stated, *supra* Part I.B., the court finds that Defendant did not provide consent to the search. Nevertheless, for the following reasons, even if the court concluded that Defendant gave consent, such consent would not be deemed voluntary.

If a consent to search is voluntary, a warrantless search is permissible under the Fourth Amendment and evidence seized will be admissible at trial. *Katz v. United States*, 389 U.S. 347, 358 n.22 (1967). In *United States v. Drayton*, the United States Supreme Court explained:

> In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own. Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion.

536 U.S. 194, 207 (2002). Courts must carefully consider the circumstances under which consent is obtained, particularly whether it was given voluntarily. *United States v. Parson*, 599 F. Supp. 2d 592 (W.D. Pa. Feb. 25, 2009). Consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

The government carries the burden of proving by a preponderance of the evidence that the consent was freely and voluntarily given. *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989); *Schneckloth*, 412 U.S. at 222. In determining whether a consent to search is voluntary, a court must look at the totality

13

of the circumstances. *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009). The
Third Circuit has instructed that relevant factors to consider include:

> the age, education, and intelligence of the subject; whether
> the subject was advised of his or her constitutional rights;
> the length of the encounter; the repetition or duration of
> the questioning; [ ] the use of physical punishment[;] . . .
> the setting in which the consent was obtained[;] and the
> parties' verbal and non-verbal actions.

*Id.* (internal citations and quotations omitted). These factors are not applied
mechanically and no one factor is dispositive. *Id.* Thus, the court may examine any
and all factors that are relevant to whether Defendant's consent was voluntary.

The court has already found that Defendant did not consent to the search
of the vehicle. *See supra* Part I.B.n.6. However, even if Defendant provided consent,
the circumstances under which he did so fail to support the Government's burden in
establishing that the consent was freely and voluntarily given. Although Defendant's
age, education, and intelligence were topics not explicitly explored at the hearing, the
court believes none of these weigh heavily in favor of either conclusion. However,
several factors weigh strongly against a finding of voluntariness. The officers
repeatedly asked and probed Defendant for his consent, despite his repeated refusal to
provide it. Although there was neither physical punishment nor physical restraints
involved, Defendant was not free to leave, for, if he did, he would be in violation of a
court mandated program resulting in his direct return to jail. (*See* Gov. Exh. 11.)
Indeed, the setting of the encounter and circumstances surrounding the consent weigh
heavily in favor of a finding of involuntariness.

Perhaps most significant to the finding of involuntary consent are the
officers' actions. Agent Hans confiscated Defendant's car keys and placed them on
the panel's table squarely in front of Defendant as he stood in front of the panel of
parole officers and officials. Agents Hans and Shaffer then took the keys and were

14

nearly out the door to search the vehicle before Director Evans first requested Defendant's consent, non-verbally indicating that the officers would execute a warrantless search notwithstanding Defendant's response. Moreover, after Defendant refused consent, Agent Latsha indicated that they need not belabor the point and directed the officers to search the vehicle without Defendant's consent. It was only after this that Defendant relented and acquiesced to the request, if he did at all.

In summary, the court has found that Defendant did not consent to the search of the vehicle. Assuming, *arguendo*, that he did, in fact, give consent, the court finds that it was only provided in response to the officers' show of authority and non-verbal actions at a place that he was not free to leave. The facts presented here fail to demonstrate a clear expression of consent. Accordingly, for the reasons stated below, the evidence seized from the vehicle will be suppressed.

### C.   <u>Suppression of evidence</u>

The fact that a Fourth Amendment violation occurred does not mean that the evidence obtained as a result of the search must be suppressed. *Davis v. United States*, — U.S. —, —, 131 S.Ct. 2419, 2426 (2011); *Herring v. United States*, 555 U.S. 135, 140 (2009). Rather, suppression is warranted only if it will deter future Fourth Amendment violations. *Davis*, 131 S.Ct. at 2426-27. To determine whether the exclusionary rule applies to a particular case, the court must "weigh the benefits of the rule's deterrent effects against the costs of exclusion, which include 'letting guilty and possibly dangerous defendants go free.'" *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010) (citing *Herring*, 555 U.S. at 141). Courts typically exclude evidence when "police conduct is 'deliberate, reckless, or grossly negligent,' or when it will deter 'recurring or systematic negligence.'" *Id.* (citing *Herring*, 555 U.S. at 144).

### 1.   Evidence seized from the vehicle

In this case, the information gained from the unlawful search must be suppressed.  As explained more fully above, even though Defendant was a parolee, Pennsylvania law provides him some protection against the prying eyes of his parole officers.  *Rivera*, 727 F. Supp. 2d at 376.  The officers stepped over that line and violated Defendant's rights when they searched his vehicle without reasonable suspicion and without his voluntary consent.  The fact the vehicle did, indeed, contain drugs does not negate the fact that the officer's actions constituted a violation of Defendant's constitutional rights.  *Franco-Felix*, Crim. No. 12-00473, 2013 WL 178102, *7 (D.N.J. Jan. 16, 2013) (citing *Bell v. Maryland*, 378 U.S. 226, 328 (1964)).  In addition, the court finds that the officers' actions were sufficiently deliberate that exclusion can meaningfully deter such future actions.  *See Herring*, 555 U.S. at 144 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.").  Accordingly, the court will suppress the contraband that was seized from the vehicle.  *See United States v. Katzin*, 769 F.3d 163, 182 (3d Cir. 2014) (explaining that suppression is warranted if the officers "had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment").

16

## 2.     Defendant's statements

Also before the court is Defendant's motion to suppress the statements he made to Harrisburg police officers after he learned that evidence had been seized from his vehicle.  Defendant does not dispute that he waived his Miranda rights (Doc. 23 at p. 10 of 12), but instead seeks suppression of his statements because they arose from the illegal search of his vehicle and should therefore be rendered fruit of the poisonous tree.  (*Id.* at pp. 10-11 of 12.)  The primary question is whether, given the illegality of the search, the incriminating statements resulted from the "exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 487 (1963).

In deciding whether the primary taint was purged, it is important to consider that Defendant was given Miranda warnings.  This fact alone, however, does not by itself remove the taint of the illegal search.  *United States v. Johnson*, Civ. No. 12-291, 2012 WL 5354601, *9 (E.D. Pa. Oct. 31, 2012) (citing *Brown v. Illinois*, 422 U.S. 590, 602-603 (1975) ("But the Miranda warnings, alone and per se, . . . cannot assure in every case that the Fourth Amendment violation has not been unduly exploited.")).  Based on the facts of this case, the court cannot conclude that Defendant's statements were made by acts of free will independent of the illegal search of his vehicle.  Defendant's statements were obtained in connection with an unconstitutional search and seizure of evidence, and any statements made by Defendant were obtained almost simultaneously with the Fourth Amendment violation with no intervening circumstances.  *See id.*  The drug evidence was obtained from the vehicle, and Defendant was immediately placed into custody and interrogated at the scene.  Therefore, the Government has not sustained its burden to

show that the taint of the illegal conduct had dissipated such that Defendant's statements may be admitted against him.

**IV.**        **Conclusion**

The parole officers exceeded the bounds of the law when they searched Defendant's vehicle.  The Government has failed to provide the requisite reasonable suspicion to conduct a search of the vehicle and it has failed to establish that Defendant gave consent freely and voluntarily.  To deter future violations, exclusion is the remedy warranted here.  Defendant's motion to suppress evidence obtained during the search as well as his statements made in connection with the illegally seized evidence will be granted.


                                        s/Sylvia H. Rambo
                                        United States District Judge

Dated:  November 20, 2014.

18